# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | |
|---|---|
| Gregg W. Pessman, | |
| Plaintiff, | Case No. 3:18-cv-50243 |
| v. | Honorable Iain D. Johnston |
| Trek Bicycle Corporation, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gregg W. Pessman brings this action against Trek Bicycle Corporation ("Trek")[1] seeking recovery for injuries he sustained while cycling near Cordova, Illinois. He claims strict liability (Count I), negligence (Count II), breach of the implied warranty of merchantability (Count III), and breach of express warranty (Count IV). Dkt. 1. Trek moves for exclusion of Pessman's proffered expert and for summary judgment. For the reasons explained in detail below, the Court grants Trek's motion to bar the testimony of Pessman's proffered expert [57]. Furthermore, the Court grants Trek's motion for summary judgment in part and denies it in part [58]. Although Trek is entitled to judgment as a matter of law on Pessman's strict liability and negligence claims, Pessman's breach of warranty claims will move forward.

---

[1] In the interest of full disclosure, as the undersigned has previously informed counsel for both parties, the undersigned currently owns two Trek bicycles: a 2020 Trek Domane SLR9, and an early model Trek Project One, a precursor to the Madone, which the wrenches at Machinery Row Bicycles refer to as "a Madone lookin' thing". Both rides are made of carbon fiber.

## I.     Background

On September 4, 2016, Gregg Pessman was riding his Trek Madone 5.2 road bicycle on a black-top cycling path near Cordova, Illinois. Dkt. 63, ¶ 3, 19. Pessman had ridden on that path many times before and was familiar with it. *Id.* ¶ 19. While in the saddle and traveling at a moderate rate—thirteen to fifteen miles per hour—Pessman was thrown over the handlebars and off the bicycle. *Id.* ¶¶ 20–21. The bike had abruptly stopped even though Pessman had not heard any noise or otherwise sensed anything odd. *Id.* ¶ 21. Though the front wheel of the bicycle had been pushed backwards toward the bike frame, Pessman did not see anything on the path that would have caused his fall. *Id.* ¶¶ 22–23. Two of Pessman's friends—Mike Wilner and Mary Bertrand—were at the scene as well. Arriving shortly on the scene after the accident, Wilner noticed that a spoke in the front wheel was broken. *Id.* ¶¶ 24–25. Like Pessman, Wilner did not see anything on the path that would have caused the accident. *Id.* ¶ 26. Since then, Wilner explains that he noticed damage to the bicycle frame near the bottom of the head tube—though he does not know if the damage was caused by the accident, or if the damage caused the accident. *Id.* ¶ 28. Though Wilner did not notice the damage to the head tube until later, Bertrand noticed it right after the accident when she and Wilner arrived on the scene. She explains that the head tube and front fork[2] looked "blistered" and "funny." *Id.* ¶ 31.

---

[2] The head tube is the vertical frame bar at the front of the bike that connects to the handlebars and the front wheel via the front fork and rotates to allow the rider to turn the bicycle. The front fork is the part of the bicycle that connects the head tube to the front wheel. The fork fits over the top of the front wheel and then connects to the center of the front wheel. Todd Downs, *The Bicycling Guide to Complete Bicycle Maintenance & Repair for Road & Mountain Bikes*, vi–vii (5th ed. 2005) (depicting a diagram of a road bicycle).

Like Wilner, she also did not notice any debris on the pathway that could have caused the accident. *Id.* ¶ 32.

At some point before the accident, Pessman told Mary Bertrand that he noticed an issue with the bicycle. Something wasn't right with the head tube, and so he took it to Mead's Bicycle shop for maintenance. *Id.* ¶ 29. Pessman also explained in his deposition that he wanted to take the bicycle in for maintenance before the Register's Annual Great Bicycle Ride Across Iowa (better known simply as RAGBRAI). Dkt. 60-2, at 8. Pessman had originally bought the bicycle from that shop, and at the time of accident, Pessman had ridden the bicycle for nearly 10,000 miles. Dkt. 63, ¶¶ 5–6. The maintenance took place in late June 2016. *Id.* ¶ 7; Dkt. 60-2, at 9 (Deposition page 29, line 10, referring to "late June of 2016). Bryce Mead has worked in the bicycle industry since 2007. But since 2004, he has owned the shop and been an authorized Trek dealer. Dkt. 63, ¶¶ 8–9. Though Trek does not supervise Mead's shop, the parties dispute whether it exercises control over the shop through the Trek Bicycle Dealer Agreement. *Id.* ¶¶ 10–11. Trek, however, does not provide Mead with any training to better detect cracks in its carbon fiber bike frames. *Id.* ¶ 41.

During the maintenance, Mead visually inspected the bicycle, but he didn't see any signs of excessive wear and tear. *Id.* ¶ 12. Mead did, however, notice that some paint had chipped off the front of the fork. *Id.* ¶ 13; Dkt. 60-3 at 9 (Mead Dep. 29:9–11. The paint had chipped while Mead tightened the nut that holds the front brake caliper to the front fork. Because he thought this was a simple paint problem,

3

he glued the paint chips back to the frame and told Pessman about it. Dkt. 63, ¶ 17. Pessman explains that he had not noticed any paint chipping before the maintenance. *Id.* ¶ 18. Regardless of the opinion of Pessman's proffered expert, the parties agree that Mead "did not overtighten this bolt or tighten it to the point where it would damage the carbon fiber frame." *Id.* ¶ 14 ("As he tightened a 'star nut' that holds the front brake caliper to the front fork, some paint chipped away from the fork so he glued the paint chips back into place. Exhibit C, at pg. 30; Exhibit F, at para. 10-11. He did not see any damage to the front fork. Exhibit C, at pg. 30. *He did not overtighten this bolt or tighten it the point where it would damage the carbon fiber frame.*").[3] Furthermore, Mead's routine maintenance procedure includes checking the connections around the bicycle and ensuring nothing torqued beyond the manufacturer's recommendations. *Id.* ¶ 15.

## II.   **Daubert Motion**

Pessman hired Kent Godsted as his expert witness, who then prepared a technical report. *Id.* ¶ 33. Godsted explains that the bicycle's frame is made out of carbon fiber. He notes carbon fiber is light weight, but stiff. So, it has some "ideal properties" for bicycles, but it is also prone to cracking. *Id.* Godsted reports that when he inspected the bike, it had large cracks in the frame in multiple directions under the paint chips that Mead had glued back on. *Id.* ¶ 34. In his technical report, Godsted offered several opinions, which Pessman proffers as expert evidence and that Trek now challenges.

---

[3] The Court treats this fact as established for the case under Rule 56(g). Fed. R. Civ. P. 56(g). It cannot be contested.

Godsted opined generally that the cause of the accident was a crack in the frame of Pessman's Trek Madone 5.2 bicycle, which was misdiagnosed by Bryce Mead as a simple chipping of the paint of the frame. He believes the crack increased in size between the time of the maintenance and the accident. He further explains that "all carbon fiber frames are prone to cracking and damage due to poor maintenance, rough handling and usage, and accidents." Dkt. 61-1, at 5 (explaining further, "Once a crack is initiated, the crack will lengthen over time and use."). Godsted notes that Mead's maintenance included an adjustment of the frame and fork assembly, that he followed Trek's protocols and procedures, but that Mead was wrong to overlook the chipped paint. *Id.* He further opines, "in the over two months between the bicycle maintenance and the accident and 1,136 miles of use the crack in the frame lengthened sufficiently so that the lower bearing near the fork fell out, the front wheel moved toward the frame causing the front tire to rub on the frame and the bicycle stopped suddenly, and the accident ensued." *Id.* He further opines that the cracking in the bicycle's frame was the root cause of the accident and that it could have been prevented if Trek had an effective dealer training program in place and had Mead performed a more informed examination during the maintenance. *Id.*

Trek moves to bar the testimony of Kent Godsted as an expert witness. In federal court, expert evidence is governed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702. *Love v. United States*, No. 20-3534, 2021 U.S. App. LEXIS 32879, at *4–5 (7th Cir. Nov.

4, 2021) (discussing the applicability of the federal rules to expert testimony); *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 871 (7th Cir. 2021) ("Rule 702 and *Daubert* govern the admissibility of expert testimony."). Federal Rule of Evidence 702 provides the analysis of when to admit a proffered expert's testimony. The expert may testify if:

> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)    the testimony is based on sufficient facts or data;
> (c)    the testimony is the product of reliable principles and methods; and
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. *Daubert* explained that the court must act as a gatekeeper, and that the rules of evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. In performing this task, district courts analyze three areas: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Kirk*, 991 F.3d at 872 (quoting *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017)). As the proponent, Pessman bears the burden of establishing the requirements of Rule 702 by the preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Here, even if Godsted's testimony is relevant, he is not qualified for this case, and his report lacks sufficient reliability.

6

### a. Qualifications

Trek challenges whether Godsted is a qualified expert *for this case*. Specifically, it challenges whether he is qualified to offer expert testimony regarding the failure of a carbon fiber bicycle frame and regarding Trek's failure to train Bryce Mead. Dkt. 57, at 10. Godsted's curriculum vitae explains that he holds bachelor and master's degrees in mechanical engineering from the Illinois Institute of Technology. Dkt. 61-2, at 2. But he has never worked for any company that designs or manufactures bicycles or bicycle components. Dkt. 63, ¶ 46. Though extensive, his professional experience involves the development of containers and fasteners, including in the construction and automobile industries. *Id.* ¶ 47. Of the seventy-eight technical reports he has prepared as a reviewing expert, none have involved bicycles. *Id.* ¶ 44. Nor has he testified regarding the design, manufacture, or maintenance of bicycles in other cases. *Id.* ¶ 45. But the Court is less concerned with his lack of specific experience with bicycles than it is with his lack of experience with carbon fiber, the material that failed in this case. Godsted has no direct experience working with carbon fiber. *Id.* ¶ 49.

Pessman contends that Godsted's formal training in mechanical engineering and his experience give him sufficient knowledge regarding "the impact of the breakdown or failure of particular materials, including carbon fiber." Dkt. 61, at 5. He furthermore points to Godsted's expert testimony regarding exercise equipment in other cases, though those devices were not made out of carbon fiber. Pessman

7

further asserts that Godsted's knowledge and expertise allow him to research and understand studies and data and to opine on potential causes of accidents. *Id.*

An expert witness may be qualified based on his or her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The problem here is that Pessman has failed to establish that Godsted has any knowledge, skill, experience, training, or education with carbon fiber, which is the material the bicycle was made of and that failed. Courts do not ordinally require that a proffered expert be a specialist in a particular field. *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016). Instead, the choice to give less weight to the expert opinion because of his lack of specialization is for the jury. *Id.* ("The fact that an expert may not be a specialist in the field that concerns her opinion typically goes to the weight to be placed on that opinion, not its admissibility."). But Godsted's knowledge education and experience in mechanical engineering, containers, and fasteners does not include any mention of carbon fiber, such that his expertise bears on the facts of this case.

The *Daubert* inquiry is not meant to remove the jury from credibility determinations. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). But the purpose remains "to scrutinize proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). And although the courts do not necessarily require the individual to be an expert in a particular field, the proposed expert is required to have more than general knowledge in the subject

8

area. In *Hall*, the court analyzed a medical doctor whose extensive experience and other qualifications focused on pediatric neurosurgery. 840 F.3d at 928. The Seventh Circuit explained, "We do not doubt that Dr. Ruge is an intelligent doctor who possesses considerable knowledge about surgery, pediatrics, and neurology. However, the record lacks sufficient evidence demonstrating that this knowledge and the related experiences render Dr. Ruge qualified to opine about Weekley's heart." *Id.* at 930. In this case, Godsted's general education regarding mechanical engineering and his experience with fasteners and containers does not render him qualified to offer an expert opinion regarding the carbon fiber bicycle frame at issue.

This determination is not based on Godsted's credibility as an expert, which remains the province of the fact finder. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination."). Instead, the Court holds that Pessman has failed to meet his burden of establishing that Godsted is qualified to offer expert testimony regarding carbon fiber bicycle frames. *Lewis*, 561 F.3d at 705. To hold otherwise would be to abandon this Court's responsibility as a gatekeeper.

Godsted's report also proffered an opinion regarding Trek's failure to train Mead in the proper discovery of cracks in carbon fiber bicycle frames. The Court must assess his qualifications regarding each opinion challenged by the defense. *Gayton*, 593 F.3d at 616–18 (determining qualifications to offer opinions as to each conclusion). And Trek challenges Godsted's opinion that "to a reasonable degree of

9

engineering certainty, [the accident] could have been prevented by an effective and responsive dealer training program by TREK and a closer and more informed examination by Mr. Mead." Dkt. 61-1, at 5. Trek contends, "Nothing in Mr. Godsted's training or experience as a mechanical engineer qualifies him to render a reasonably reliable opinion with respect to how a manufacturer should educate it's authorized dealers to maintain its products." Dkt. 57, at 11. Indeed, nothing in Godsted's experience and training seem to qualify him to offer this opinion. And even if he is qualified, Pessman fails to illuminate such qualifications. In response to Trek's *Daubert* motion, Pessman fails to even mention Godsted's conclusion regarding any dealer training program. So, he has again failed to meet his burden of establishing that Godsted is qualified to offer this conclusion.

### b. Reliability

Even when an expert is qualified, she may still be barred from testifying. "A court's determination that an expert possesses the requisite qualifications does not, without more, provide a sufficient basis for admissibility." *Kirk*, 991 F.3d at 873. The Court would not be fulfilling its obligation as a gatekeeper if it allowed a qualified expert to articulate opinions to the jury that are not based on a reliable scientific method. *Id.* at 874 (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). Furthermore, the expert may not rely on "speculation, unsupported assumptions, or conclusory allegations." *Buscaglia v. United States*, 25 F.3d 530, 533 (7th Cir. 1994).

In writing in his expert report, Godsted did not perform any scientific test or experiments, although the Court does not find this failure to be dispositive. He examined the bicycle for fifteen to twenty minutes, interviewed Gregg Pessman, and reviewed plaintiff counsel's interview with Bryce Mead. Furthermore, he reviewed Trek's owner's manual and found a few sources on the Internet. Although he argued that his education prepares him to "research and understand studies and data," critically, there is no evidence that he did so. The lack of experimentation or testing *might* have been overcome by an analysis of relevant and reliable scientific literature, but again, there is no evidence that any analysis occurred. Though peer-reviewed scientific studies may exist regarding carbon fiber bicycle frames, and the causes of bicycle accidents, he has not cited any, nor does he appear to have reviewed any. Dkt. 61, at 5. To be sure, Pessman may be able to present evidence that carbon fiber frames are prone to cracking; after all, Trek's literature admits as much. But the Court does not need Pessman's expert to accept statements from a party opponent. Fed. R. Evid. 801(d)(2).

But Godsted's technical report goes further than that. He opines that the frame cracked, and then the crack widened over time until it finally failed and caused the accident. This might be a reasonable layperson's hypothesis, but it is not supported by reliable science in the record before this Court. For example, his opinion, in part, relies on the recall of Trek's Farley line of bicycles. Dkt. 61-1, at 3. In doing so, Godsted speculates that issues with one model of bicycles carries over to Trek's other models. And maybe his hypothesis is correct, but he does not explain

11

how he came to this conclusion through any scientific methodology; indeed, there's no explanation of any kind. *Id.* An expert's opinion must be supported by appropriate validation. *Daubert*, 509 U.S. at 590. The Court cannot even begin to determine if an appropriate validation exists when it does not even know the basis for the opinion. Furthermore, Godsted offers an opinion that the accident could have been prevented if Trek implemented an effective dealer program. Again, Godsted might be correct, but he fails to even articulate any basis for his belief. And he doesn't appear to have actually considered the viability of Trek's Dexter site, which is a business-to-business Internet website designed to offer guidance, training, and other resources to authorized dealers like Mead. Dkt. 62-3, at 15 (Schumacher Dep. 14, Pl.'s Ex. M).

Thus, Pessman has failed to meet his burden of establishing the reliability of his proffered expert. Trek's motion to exclude Godsted's testimony under Federal Rule of Evidence 702 and *Daubert* is granted.

## III.    Motion for Summary Judgment

Pessman brings claims of strict liability, negligence, and breach of the implied warranty of merchantability. Trek moves for summary judgment on all counts. Because Pessman concedes that summary judgment is proper on his strict liability claim, the Court need only consider Pessman's claims of negligence and breach of warranty. Dkt. 62, at 2.[4]

Summary judgment is warranted if the evidence presents no genuine dispute

---

[4] The Court commends and appreciates Pessman's counsel for his candor in conceding a claim that should not continue to be litigated.

of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The Court must "construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013) (quoting *Goetzke v. Ferro Corp.*, 280 F.3d 766, 774 (7th Cir. 2002)). The initial burden lies with the movant to either show an absence of evidence supporting an essential element or to present affirmative evidence showing that an essential element cannot be satisfied. *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). Then, the burden shifts to the nonmoving party to present evidence that establishes a genuine issue of material fact as to that element. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009) ("Thus, to survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case."). But a dispute of fact is only material if it might affect the outcome of the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And if a dispute of fact exists, so that "[a] reasonable jury could resolve [the] conflict either way," the conflict "makes it inappropriate to grant summary judgment." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018).

### a. Negligence

Count II of Pessman's complaint pleads negligence. He asserts that Trek was negligent in the design, manufacture, sale, and marketing of the Trek Madone 5.2 Road Bike. Dkt. 1, at 6, ¶ 7. The complaint alleges that the carbon fiber frame was prone to fracturing and that Trek provided inadequate instruction and warning to

that effect. *Id.* ¶ 7(a)–(b). It further alleges that Trek provided inadequate training to its authorized dealers and repair facilities. *Id.* ¶ 7(c).

In its motion for summary judgment, Trek contends that no design defect existed, that it did not fail to warn of any danger in using the bicycle, and that it cannot be vicariously liable for the actions of Bryce Mead because he was not Trek's agent. Dkt. 58, at 5–10. Pessman's response fails to surmount Trek's arguments regarding negligence. Although he avers generally that some of the evidence should be enough to put the question of negligence to the jury, his arguments are unavailing. Pessman's primary focus is whether Mead acted as an agent of Trek.

### 1. Design Defect

Trek moved the Court for summary judgment on any design defect theory of negligence. Dkt. 58, at 6. Indeed, manufacturers have a duty to take reasonable care when designing their products. *Calles v. Scipto-Tokai Corp.*, 864 N.E.2d 249, 264 (Ill. 2007) ("The crucial question in a negligent-design case is whether the manufacturer exercised reasonable care in the design of the product."). Here, to the extent that Pessman intended to proceed with this claim, he has presented no evidence that the Trek Madone bicycle was negligently designed. For example, he has offered no expert to testify regarding possible alternative designs. The Seventh Circuit often refers to the summary judgment stage as the "put up or shut up" stage. *Reed v. Brex, Inc.*, 8 F.4th 569, 578 (7th Cir. 2021) ("Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of

14

events." (quoting *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020))). Because Pessman has not "put up," Trek is entitled to summary judgment.

### 2. Failure to Warn and Instruct

Pessman makes passing reference to a failure to warn or instruct. His complaint alleges an "inadequate instruction and warning to Defendant's ultimate users" as well as "inadequate instruction, warning, and training." Dkt. 1, at 6, ¶ 7. In its motion for summary judgment, Trek argues that Pessman has not established the presence of a defect, that Pessman has presented no evidence that the warnings were inadequate, and that Pessman has failed to present any evidence about what warning would have been adequate. Dkt. 58, at 7–8. As stated above, Pessman does not meaningfully respond to this argument.

The only time Pessman recognizes that Trek moved for summary judgment on the failure to warn or instruct theory is when he asserts, "At the very least, there exists a genuine issue of material fact regarding whether Defendant provided inadequate instruction and warning to Plaintiff, and other ultimate users, concerning the dangers associated with its carbon fiber bicycle frames, and whether there was likewise inadequate instruction, warning, and training to Defendant's authorized service/repair representative, Bryce Mead." Dkt. 62, at 5. But he never explains how the warning was inadequate.

The parties agree that Pessman was given a copy of the owner's manual with his purchase of the bicycle. Dkt. 63, at 70. They further agree that the manual warns owners that "Something as simple as an under-tightened bolt, can, over time,

15

cause a part to break, leading to loss of control and an accident." *Id.* ¶ 71. The manual continues that increased mileage on the bicycle reduces its lifespan. *Id.* It further warns that "Any form of crack, scratch or change of coloring in a high stress area indicates that the life of the component has been reached and the component should be replaced." *Id.* The sentence immediately preceding that warning explains, "If the lifespan of any part of the bicycle (including the frame, fork and components) has been exceeded, the part might suddenly break and cause you to lose control and fall." *Id.* Furthermore, the manual warns that the carbon fiber frames will not bend if overloaded but will instead break. *Id.* The manual further warns about the nature of carbon fiber:

> !WARNING: Carbon fiber can conceal damage from an impact or crash. A carbon fiber part that has previous damage can break suddenly, causing serious injury or death. If you suspect your bicycle has had an impact or crash, immediately stop the bicycle. Inspect the part before riding, or take the bicycle to your dealer for service.

*Id.* Furthermore, the parties agree that the owner's manual "warns that paint discoloration or any change in the appearance of the bicycle can indicate the presence of a crack." *Id.* ¶ 55.

Pessman does not explain how these statements in the owner's manual amount to a failure to warn Pessman or instruct him. Nor has Pessman offered any evidence to counter Trek's evidence that it did warn and instruct. He has proffered no experts to testify on what constitutes a proper warning. And, as explained above, he has not actually responded to Trek's motion for summary judgment on this theory. His failure to meaningfully respond amounts to forfeiture. *Haley v. Kolbe &*

16

*Kolbe Millwork Co.*, 863 F.3d 600, 612 (7th Cir. 2017) (invoking waiver of arguments because the plaintiff-appellants failed to raise the arguments at the district court in response to the defendant's motion); *Bontes v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument—as the Bontes have done here—results in waiver.").

But, even without forfeiture, Trek is entitled to summary judgment on Pessman's failure to warn and instruct theories. As Trek points out, the elements of a failure to warn theory under Illinois law are (1) that the defendant knew or should have known about a dangerous propensity of its product, (2) that the defendant failed to adequately warn the plaintiff about that propensity, and (3) that the failure proximately caused the injury in question. *Woodill v. Parke Davis & Co.*, 402 N.E.2d 194 (Ill. 1980); *see also Vhora v. Michelin N. Am., Inc.*, No. 98 C 2657, 1999 U.S. Dist. LEXIS 1246, at *8 (N.D. Ill. Feb. 3, 1999). Failure to instruct regarding the proper handling of a dangerous product is a different claim than a failure to warn of that dangerous quality. *Betts v. Manville Personal Injury Settlement Trust*, 588 N.E.2d 1193, 1222 (Ill. Ct. App. 1992). Though are they different theories, the analysis remains the same. Restatement (Third) of Torts: Products Liability § 2 (1998).

Trek argues that "assuming that some defect was present, there has been absolutely no evidence by any witness that the warnings on the subject bicycle or in the Owner's Manual were inadequate." Dkt. 58, at 8. Trek is correct. Pessman cannot establish that Trek failed to adequately warn or instruct. Trek has shown in

17

its owner's manual that it warned Pessman of these potential dangers and instructed him to cease using the bicycle and bring it in for maintenance at the first sign of any crack, scratch, or discoloration. Pessman has offered no evidence in rebuttal that such warnings and instructions were insufficient. Thus, he has failed to show a genuine dispute exists as to that element. Fed. R. Civ. P. 56(c)(A) (explaining that to show a genuine dispute, the party must cite to evidence in record). Because Trek has shown that Pessman cannot establish a necessary element, it is entitled to summary judgment on Pessman's failure to warn and instruct claims.

### 3. Failure to Train

Pessman's complaint alleges that Trek had a duty to train Mead and that it did not adequately meet this duty. Dkt. 1, at 6, ¶ 7(c). Trek moves for summary judgment on this claim. In support it contends that Pessman cannot establish that it owed a duty to Pessman to train Mead and that, even if it did, Pessman cannot show that Trek breached that duty. Dkt. 58, at 9.

First, Pessman has not cited, and the Court has been unable to find any case in Illinois recognizing that a manufacturer has a duty to train its authorized dealers. The only case the Court has found that comes close is the case that Trek cites, which explains that Illinois does not recognize such a claim. *Ramm v. W&D Machine Co.*, No. 92 C 7478, 1994 U.S. Dist. LEXIS 13900, at *8 (N.D. Ill. Sept. 29, 1994). There, a court in this district explained that although "Illinois courts have never adopted the argument that a manufacturer has a duty to train its purchaser's

18

employees, Illinois law recognizes that a defendant may voluntarily assume a duty not otherwise imposed on him by law." *Id.* But even that case did not deal with authorized dealers that sell products in the stream of commerce. Rather, it contemplated situations in which a manufacturer sells equipment to a company whose employees directly used the equipment. *Id.* at *1–2.

Even assuming this form of products liability negligence is recognized in Illinois, Pessman has presented no evidence sufficient to establish a prima facie case. Pessman has offered no evidence that the instruction in the owner's manual is insufficient to meet any duty of care. The most Pessman can point to is Mead's statements that Trek did not provide him with personal training regarding the identification of cracks in the bicycle's frame. Trek did, however, provide information and instruction on potential cracks in the owner's manual that comes with the bicycle. Furthermore, Pessman's attempt to rely on Godsted's report is unavailing. Godsted opined that the accident "could have been prevented by an effective and responsive dealer training program by TREK and a closer and more informed examination by Mr. Mead." Dkt. 61-1, at 5. As the Court previously explained, Godsted is not qualified to testify regarding any industry standards to provide training to authorized dealers. Nor does his opinion attempt to do that. His opinion seems to go to causation; he opines that if Mead had looked closer and been better trained, then his maintenance could have prevented the accident. But he

19

never opines regarding the industry standard for manufacturer training of authorized dealers.[5]

Because Pessman has failed to present any evidence of what, if any, duty Trek owed to train Mead, he has failed to establish his facie case. That failure entitles Trek to summary judgment on Pessman's claim of failure to train. *Kimbrough v. Jewel Cos.*, 416 N.E.2d 328, 331 (Ill. Ct. App. 1981) (granting judgment as a matter of law because of plaintiff's failure to establish an element of her prima facie negligence case).

### 4. Agency

In its motion for summary judgment, Trek argues that if Pessman is alleging an agency relationship between Trek and Mead, then no evidence exists to support that claim. Dkt. 58, at 10; *see also* Dkt. 1, at 6, ¶ 6 (referring to Mead as "Defendant's agent"). The question of what type of relationship existed is typically a question for the fact finder. If the facts are undisputed, however, it becomes a question of law appropriate for summary judgment. *Anderson v. Boy Scouts of America, Inc.*, 589 N.E.2d 892, 894 (Ill App. Ct. 1992).

In some circumstances, a principal may be held liable for the acts done by its "agent or employee acting within the scope of his agency or employment." *Lang v. Silva*, 715 N.E.2d 708, 716 (Ill. Ct. App. 1999). That generally requires a showing that an agency relationship existed, that the principal controlled the conduct of the

---

[5] The Court notes that neither party addressed the deposition testimony that Trek does in fact provide its authorized dealers with a business-to-busines website (Dexter) that includes certification and information on bicycle maintenance. It was referred to as "basically a one-stop shop for a retailer to answer their questions." Dkt. 62-3, at 15.

alleged agent, and that the alleged conduct of the agent fell within the scope of the agency relationship. *Wilson v. Edward Hosp.*, 981 N.E.2d 971, 978 (Ill. 2012). Because the first element would not be met, a principal is "generally not liable for the negligent or intentional acts or omissions" of its independent contractors. *Id.*

Pessman has not argued the difference between apparent and actual authority. An agency relationship based on apparent authority "arises when the principal holds an agent out as possessing the authority to act on its behalf, and a reasonably prudent person, exercising diligence and discretion, would naturally assume the agent to have this authority in light of the principal's conduct." *Saletech, LLC v. E. Balt. Inc.*, 2014 IL App. (1st) 132639, ¶ 14 (quoting *Patrick Eng'g, Inc. v. City of Naperville*, 976 N.E.2d 318, 329 (Ill 2012)). Instead, Pessman seems to focus his argument on the theory that although Trek did not supervise Mead's work, it maintained control of the business and Mead therefore acted as Trek's agent rather than an independent contractor.

"An independent contractor relationship is one in which an independent contractor undertakes to produce a given result but, in the actual execution of the work, is not under the orders or control of the person for whom he does the work." *McNerney v. Allamuradov*, 2017 IL App. (1st) 153515, ¶ 68. When determining whether an individual acted as an agent or an independent contractor, Illinois courts consider (1) the right to control the manner in which the work is performed, (2) the right to discharge, (3) the method of payment, (4) whether taxes are deducted from the payment, (5) the level of skill required to perform the work, (6)

21

and whether the alleged principal furnished the tools, materials, and equipment necessary to perform the work. *Id.* "Although no single factor is determinative, the right to control the manner in which the work is performed is considered to be the most important factor." *McNerney*, 2017 IL App. (1st) 153515, ¶ 70. Furthermore, the party claiming the existence of an agency relationship bears of burden of proving it by the preponderance of the evidence. *Curto v. Illini Manors, Inc.*, 940 N.E.2d 229, 232 (Ill. Ct. App. 2010); *Raclaw v. Fay, Conmy & Co.*, 668 N.E. 2d 114, 117 (Ill. Ct. App. 1996).

Trek points to the authorized dealer agreement, which states, "This agreement or any rights conveyed hereunder do not imply nor shall they be construed to create any partnership, agency, apparent agency franchise rights or any exclusive rights or exclusive territory for Dealer. . . . Dealer is not authorized to make any representations on behalf or to bind Trek." Dkt. 63, ¶ 11. Pessman counters that the written agreement is not dispositive, citing to the Restatement (Second) of Agency, § 220(2), cmt. m ("It is not determinative that the parties believe or disbelieve that the relation of master servant exists, except insofar as such belief indicates an assumption of control by the one and submission to control by the other.").[6] Pessman further asserts that "if the conduct of the business was such as to be inconsistent with the contract, the writing cannot be permitted to

---

[6] The Court assumes Pessman meant to cite § 220(2) of that restatement. Though he actually cited § 20, the quotation appears more like to come from § 220(2) comment m. Regardless, he is correct that the written agreement is not dispositive. *McNerney v. Allamuradov*, 2017 IL App. (1st) 153515, ¶ 69 ("Furthermore, the declaration of the parties is not controlling where the conduct of the parties demonstrates the existence of an agency relationship.").

protect the principal from liability as against an innocent third party." Dkt. 62, at 3. Pessman is correct that if the conduct of the parties demonstrates an agency relationship, the written agreement does not control. *Hiatt v. W. Plastics, Inc.*, 2014 IL App. (2d) 140178, ¶ 80.

In support of its contention that an agency relationship was formed despite the plain text of the dealer agreement, Pessman contends that Trek "effectively controls the manner in which its authorized dealers conduct their business." Dkt. 62, ¶ 6. Pessman asserts (1) that Trek benefited from Mead's efforts under the agreement (2) Trek retains the right to terminate the agreement if Mead fails to live up to the agreed standards, (3) Trek only permits its authorized dealer to have access to its service and repair website, (4) Trek requires each authorized dealer to have a certified employee on premises, and (5) financial disincentives exist when a dealer fails to meet the requirements of a certain program. *Id.* Other than listing out these purported considerations, Pessman does not offer any legal argument with citation to analogous cases, or any legal authority, to explain how these facts created an agency relationship.

None of the conduct Pessman points to persuades the Court that an agency relationship formed. He first asserts that Trek benefited from Mead's participation in the authorized dealer agreement. But that's true in any commercial transaction; that two businesses mutually benefit from a business transaction is not surprising or revealing. Second, Pessman does not explain how Trek's ability to terminate the authorized dealer agreement speaks to the type of relationship they have formed.

23

He presumably means that it is evidence of Trek's control over Mead, though he fails to explain how that is true. He next points out that Trek provides its authorized dealers access to its service repair website, and only its authorized dealers. The implication is that Pessman thinks Trek should give access to that website to everyone, though he also does not explain this theory. The website he refers to is called Dexter, and it is the portal through which Trek offers certification, training, and guides to its authorized dealers. Dkt. 62-3, at 15–16 (Plaintiff's Exhibit M). Pessman does not explain how providing more resources to an authorized dealer to assist them in their job amounts to control sufficient to form an agency relationship. And the irony here is that Pessman seemingly faults Trek for providing this resource in the same action in which he sues Trek for not providing sufficient resources.

Pessman further points to Trek's requirement that Mead have a certified employee on premises at all times and that financial disincentives exist if a dealer fails to meet the requirements of the agreement. But failing to meet the requirements of any business contract is likely to result in financial disincentives. Pessman does not explain how any disincentive here amounted to control. The only fact Pessman points to that bears at all on the level of control Trek exercises over its authorized dealers is that it requires them to maintain a certified employee on staff. But even that is not enough to put the question to a jury. At bottom, the critical analysis is not whether Trek exercised any control over Mead, but whether it had "the right to control the manner and method in which work [was] carried out."

24

*Krickl v. Girl Scouts, Illinois Crossroads Council, Inc.*, 930 N.E.2d 1096, 1100 (Ill. Ct. App. 2010). And minimum requirements on authorized dealers, like requiring that they have at least one certified employee on staff, do not amount to a control of the manner and method in which the authorized dealer works. *See Krickl*, 930 N.E.2d at 1103 (citing *Glover By and Through Dyson v. Boy Scouts of Am.*, 923 P.2d 1383, 1388 (Utah 1996)).

Thus, based on the undisputed facts, no agency relationship formed between Trek and Bryce Mead, its authorized dealer. Therefore, even if Mead were negligent in his maintenance of Pessman's Trek bicycle, Trek itself could not be held liable. It is entitled to summary judgment on this claim.[7]

### b. Breach of the Implied Warranty of Merchantability

In Count III, Pessman alleged a breach of the implied warranty of merchantability. Dkt. 1, at 7. He alleged that a crack in the carbon fiber frame, which he asserts is the cause of the accident, amounts to a breach of that warranty. *Id.* In Illinois, a breach of the implied warranty of merchantability provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to the goods of that kind." 810 Ill. Comp. Stat. § 5/2-314. To be merchantable, the good must have "a quality commensurate

---

[7] Two additional points warrant attention, though not briefed by the parties. In Illinois, agency and independent contractor relationships are not mutually exclusive. An entity can be both. *Lawlor v. N. Am. Corp. of Ill.*, 2012 IL 112530, ¶ 15. The parties here have not argued under this theory, however. And the facts as explained above show that the necessary right to control did not exist anyway. Second, although the parties briefed the question of agency, neither party briefed whether Mead's work amounted to negligence. That question has not been considered by the Court, and the Court states no opinion on it.

with that generally accepted within the trade under the description of the goods in the contract." *Brandt v. Boston Scientific Corp.*, 792 N.E.2d 296, 300 (Ill. 2003).

Trek argues that Pessman has presented no evidence that a defect existed in the bicycle at the time it left Trek's control. Dkt. 58, at 11–12. In response, Pessman notes that risks associated with carbon frames are shown in the Trek Owner's Manual. Dkt. 62, at 6. Pessman further points to testimony from individuals that arrived on the scene of the accident immediately after it occurred; they did not see anything in the path that could have otherwise caused the accident. Pessman sees this as sufficient evidence to create a question of fact regarding the cause of the accident, and therefore a question of fact regarding whether the bicycle was fit the ordinary purpose for which this type of good is sold.[8] Dkt. 62, at 6.

In reply, Trek contends that Pessman's own expert concedes that no defects existed at the time the bicycle was sold. Trek further asserts that the crack did not appear until Mead overtightened the bolt. Dkt. 67, at 9. This argument misses the mark. First, Trek successfully moved to exclude Pessman's expert, and so Trek cannot now rely on it. Second, Pessman's point was not that the bicycle became defective when Mead overtightened the bolt. Rather, Pessman's point was that the bicycle was not fit for its ordinary purpose when he purchased it, and that lack of fitness is what made it vulnerable to cracking. Dkt. 62, at 6, ¶ 2. Third, Trek stipulated that Mead did not overtighten the bolt.

---

[8] Pessman also points to his expert's opinion regarding the quality of carbon fiber frames. As explained above, the Court declines to consider this testimony.

Trek has not met its burden to establish that it is entitled to summary judgment. Whether a plaintiff must show that the item was defective appears to be an open question in Illinois. At a minimum, the case law is inconsistent. *Compare Malawy v. Richards Mfg. Co.*, 501 N.E.2d 376, 384 (Ill Ct. App. 1986) ("Although a 'defect' in a product may be evidence of a nonconformity, a 'defect' in a product is not required to be established to sustain a breach of implied warranties of merchantability.") *and Maldonado v. Creative Woodworking Concepts, Inc.*, 796 N.E.2d 662, 666 (Ill. Ct. App. 2003) (following *Malawy*); *with State Farm Fire & Cas. Co. v. Miller Elect. Co.*, 562 N.E.2d 589, 596 (Ill Ct. App. 1990) (recognizing the decision in *Malawy* and declining to follow it).

For now, however, the Court merely notes that a reasonable jury could also hear Mead's testimony and believe that he was careful and that the frame cracked because it was not fit for its ordinary purpose and was instead in a vulnerable state. In *Muller v. Synthes Corp.*, a court in this district granted summary judgment to the defendant on a breach of the implied warranty of merchantability. No. 99 C 1492, 2002 U.S. Dist. LEXIS 5919, at *23 (N.D. Ill. Mar. 25, 2002). The court granted summary judgment because the plaintiff had supplied no evidence that the medical implant failed earlier than reasonably expected. *Id.* In this case, a reasonable jury could hear the testimony from Pessman and Mead and conclude that the bicycle frame cracked earlier than expected, that it was not fit for its ordinary purpose. Pessman can point to Mead's testimony that he did not overtighten the bolt. And the parties agreed in the Local Rule 56.1 statements of

27

undisputed fact that Mead "did not overtighten this bolt or tighten it to the point where it would damage the carbon fiber frame." Dkt. 63, ¶ 14. The evidence could lead the jury to believe the bicycle was not fit.

### C. Breach of Express Warranty

In Count IV, Pessman claims a breach of an express warranty against any "defects in materials and workmanship in the frame for the lifetime of the original owner through Defendant's Trek Care program." Dkt. 1, at 8, ¶ 6. In its motion for summary judgment, Trek contends that Pessman has not established the existence of an express warranty. Dkt. 58, at 12. Even if an express warranty existed, Trek continues, Pessman "has not established that any representation made by Trek was actually breached[,] as Plaintiff has wholly failed to establish that any defect existed in this bicycle at the time of purchase or that any such defect actually caused his accident." Dkt. 58, at 12.

In response, Pessman cites to Trek's own website, which states, "We've got you covered. Every new Trek bicycle comes with the industry's best warranty and loyalty program: Trek Care. . . . Trek Bicycle Corporation provides each original retail purchaser of a Trek bicycle an amazing warranty against defects in materials and workmanship. It's our way of standing behind the bikes we make." Dkt. 62, at 6, ¶ 1 (quoting Pl.'s Ex. L, at 40, dkt. 62-2, at 40). In reply, Trek does not respond to this assertion. It merely reiterates its contention that Pessman has not established the existence of an express warranty. Dkt. 67, at 10–11. At a minimum, however, Pessman's citation is enough to create a question of fact for the jury.

Lastly, Trek's contention that Pessman has presented no evidence of a breach of any warranty fairs no better. As the Court explained above, the evidence is sufficient to present the question to a jury. Trek's own Local Rule 56.1 statement of undisputed fact explained that Mead did not overtighten the bolt. And Pessman's has presented witnesses who testified that the bike path was free of anything that could have caused the accident. The Court is left with evidence that Pessman purchased the bicycle and then it failed, and the evidence removes from contention causes of that failure other than a product defect. Thus, Trek has failed to meet its burden, and the Court denies its motion for summary judgment.

## IV.    Conclusion

For the foregoing reasons, the Court grants Trek's motion to bar the testimony for Kent Godsted [57]. The Court further grants in part and denies in part Trek's motion for summary judgment [58]. Trek is entitled to judgment on Pessman's strict liability and negligence claims, but Pessman's breach of warranty claims will continue. This case is referred back to Magistrate Judge Schneider to discuss with the parties whether a settlement conference would be worthwhile.

Date:  December 6, 2021

Honorable Iain D. Johnston
United States District Judge

29